At a Court of Over and Terminer held at this term, William Thomas was indicted for the murder in the first degree of Sarah E. Thomas, his wife, by cutting her throat with a razor, in the city of Wilmington on the 5th day of April preceding. *Page 512 
The first witness called for the State was a daughter of the prisoner, in the thirteenth year of her age, who stated that she was at her home in West Wilmington with her mother and two little sisters on Friday, the 5th day of last April, and that soon after 12 o'clock that afternoon her father left home to go to work, while her mother was lying down on the lounge and she was sweeping up stairs, and returned from his work at 5 o'clock precisely by their clock. She was then ironing, and her mother was still lying on the lounge in the room. He sat down, but did not say anything for a good while. She then asked her father what he would have for supper, and he said he did not know. She did not speak again, nor he either for five or ten minutes. She then asked him if he would not have a slice of toast with an egg on it and a cup of tea, and he said yes, and she got them for him and when they were ready he sat down at the table and ate his supper, but her mother did not eat her supper then, but remained lying on the lounge. After supper he sat down again in the room, and after sitting a short time he said he was going to bed, which was then about 8 o'clock, and arose from his seat and went up stairs. Her mother was still lying on the lounge, but in about fifteen minutes afterwards she got up and ate her supper and went to bed, and in about ten minutes after that she heard them talking up stairs in a low tone, and went to the stairs and then heard her father charge her mother with going with another man without mentioning any name, but she did not reply. She then returned to her work and went on ironing, and heard nothing else until about fifteen minutes afterwards, when she heard her father say to her mother that he wanted her to tell the truth, and heard her say she had no truth to tell. She finished ironing after 8 o'clock some time and went up stairs to bed herself with her little sisters, and saw her father and mother in bed in the back room. Her room was on the right hand side going up the stairway, and theirs was on the left, and she was just getting undressed and ready to go to bed when she *Page 513 
heard her father tell her mother to get out of bed, and her mother ask him what he wanted her to get out of bed for, and heard him say, because she was drunk. She then got out of bed and came into her room where she and her little sisters were in bed, and stood by the side of it for a while, and then went back to her own room, but when she went back into it and was going to bed again, her father who was still in bed, told her to go into their room, and she did so and he followed her into their room, and said to her that she had bought neckties and watch chains for another man. She denied it, but he said he knew she did, and told her to go and find them. She denied that she had ever bought anything, and he then took her by the arm and led her into their room, and she followed them, but her father shut the door behind him, and she then went back to her room and put on her dress, but heard him ask her mother if she wanted to die in the dark, and her answer that, of course, she did not want to die in the dark. There was no light in their room, but one was kept burning every night in hers. She then went and opened their door; her father was standing by the bed and her mother was lying on the floor, when he picked up the pitcher and said he would smash her brains out, but he did not strike her. Her mother said nothing. He told her (the witness) to go and get the razors, he was going to cut her throat, but she would not go. He then picked her up in his arms and partly carried and partly dragged her down the stairs into the back room (she and her sister Rosie following them down the stairs) and laid her down on the lounge, and then went to the cupboard in which he kept his razors, when she in her fright ran over as fast as she could with her sister to Mr. Hawk's across the street and gave the alarm. She returned alone in about five or ten minutes and went up stairs into her room where she found her little sister Sally, not four years old, standing by the side of the bed, her mother lying on the floor by the door, (but she was so frightened she hardly looked at her though she saw blood on the floor,) and her *Page 514 
father standing in their room about five feet from the door with a razor in his hand and his throat cut, and with what looked like blood on the razor, and said to him, "Father, what have you done?" He said, "Never mind Nellie dear, I've killed your mother, and cut my own throat, for I would have been hung any how." She did not remain in the room, but then went back to Mr. Hawk's. She went back to the house again after that with young Mr. Hawk to lock it up, but saw nothing of her father then. She never heard him threaten to take her mother's life before that night; and he did not seem to have been drinking either when he left home to go to work, or when he came back again that afternoon. On cross-examination she added his eyes did not look right, they looked wild, he had been sick the day before, and she noticed trembling in his hands when he left that afternoon, and that his eyes and hands were the same, and only worse when he returned that afternoon, and he was then shaking his head and talking to himself; and she had to speak to him two or three times before he would answer her. Her mother was intoxicated, and had been lying on the lounge all day, and she noticed she was very much so and staggered when she went to bed; and her father while in bed was rolling about and talking to himself. She was not frightened by the appearance of her father, because he was always very kind to her and her sisters, and to her mother when he was sober; and it was only when he got on a spree that he was. cross to her; and he had been taking a good many during the past winter. Her mother was not held down on the floor by her father up stairs at the time first referred to by her, and when he picked her up and carried her down stairs she made no resistance or outcry. Her mother had been from home from the Saturday before, until Wednesday when she came home and got ten dollars which she had hid away under the carpet, and a dress and her ear-rings and went away again, but came home without them on the day before that day, and had been intoxicated ever since she came back. Her father was sick on Thursday, the day before her mother was killed *Page 515 
and Doctor West attended him, and he had been drinking very hard for a week before that day.
The next witness was the police officer who arrested him, and who stated that he went to the house of the prisoner about half past 9 o'clock that night, and the first thing he particularly observed there was blood on the stairs, and the next was the prisoner sitting on a chair in the back room up stairs with his head inclined back against the door, and the first thing he said to him was, "what in the world have you done?" And his answer was, "I have cut my wife's throat, and my own." His wife was lying on the floor in the front room partly in his view, and one of the razors was lying on the floor near her. He arrested him and took him in a wagon to the hall; he seemed to be drunk and was cursing and swearing and talking to himself all the way there, and he then thought and said that he was either drunk, or had been drinking for some time and was crazy from the effects of it. The counsel for the prisoner having here stated that he did not deny, but admitted the killing, the Attorney General rested the case there.
Thomas Johnson, the foreman in the Harlan Hollingsworth establishment, was the first witness examined by him, and stated that he had known the prisoner as one of his workman as foreman in the establishment about five years; that he was one of their best workmen, and he never saw him drunk, but he was some times away, and he had seen him when he thought he had been drinking; he had been away until that Friday afternoon, and when he first saw him there that afternoon he was struck by his appearance, it was strange and wild and his nerves seemed tremulous, and the second time he saw him that afternoon, he came to the conclusion that he was not in his right mind.
John Edwards, a workman in the establishment, was next examined as a witness, and stated that when the prisoner came to work that afternoon, he had a very different look from any thing he had ever seen before, and he thought his mind was affected from his strange and wild appearance. He had seen him intoxicated, but he was not intoxicated then. It was something more and worse than intoxication that affected him then.
William Boney, another workman in the establishment was then examined as a witness, and stated that he was the prisoner's helper in it for three weeks, and that afternoon his complexion was very white, and his look was wild, and he said he felt horrible, and while the iron would be heating instead of watching it closely as was and had always before been his custom, he would be looking out of the windows and talking to himself; and he thought then his mind was not right, owing to his having been on a spree for several days before and the effects of liquor, *Page 517 
but he was not then drunk or intoxicated. And another helper at riveting on that occasion corroborated the foregoing statement, adding that he was not like he had ever seemed before; he was wild-looking, and would every now and then be looking quickly and strangely, looking back over his shoulder, and out of the windows, as well as talking to himself, and he then thought he was not in his right mind, but he was not drunk or intoxicated.
Another witness, Michael Connell, was examined and stated that he had known the prisoner five years, and in the afternoon of that day between four and five o'clock he saw him walking very rapidly and swinging his arms violently on Front street, in his shirt sleeves with his working apron rolled up in front of him, and his manner as well as dress was so strange for him on the street that he attracted his particular attention, and he at once thought there was something wrong in the mind of the man. He had seen him under the influence of liquor, but he was not then drunk or intoxicated; he was, however, very much and very strangely and wildly excited both in his appearance and manner on that occasion. While other witnesses who were also at work that afternoon in the same establishment, stated that he strangely and abruptly left it between those hours with his working apron and old hat on and his sleeves rolled up, leaving his good coat, vest and hat behind where they usually hung when he was at work.
Dr. S. L. West was also examined as a witness and stated that he had known the prisoner between three and four years and had been his physician twice in that time, the last time he was to see him was on Thursday preceding the day on which his wife was killed. He had been drinking hard and was anxious to get off his spree and get back to his work, and he considered from the symptoms that he was affected with what is termed delirium tremens, and was treating him accordingly, but was surprised *Page 518 
to find him much better the next morning. He thought he would be in a fit condition to go back to his work by the afternoon of that day, and administered a tonic and then told him, if he thought himself strong enough he could go to work that afternoon, as he informed him that he had been sent for and was wanted at the establishment, and enquired of him if he could go to work by that time. Delirium tremens is considered by the medical faculty to be a species of mental unsoundness or insanity, superinduced by the intemperate use of intoxicating liquor.
Dr. Howard M. Ogle testified that he saw the prisoner that night after he had been arrested and taken to the hall, and also on the next day, and again on the day following that, in the jail at New Castle, and that he was then under great cerebral excitement; and several other physicians who had heard the testimony of the preceding witnesses, were examined and expressed the opinion that the prisoner at the time of committing the homicide was suffering under an attack of deliriumtremens, and stated that it is a species of insanity, and that the attacks of it are almost invariably more violent in the evening than during the day.
The police officer who arrested the prisoner was then recalled by the Attorney General and stated that when he was about to arrest him at his residence, he told him there was money in the house, and when he asked him where it was,, he said there was twenty-five dollars in his pantaloon's pocket in another room to which he directed him, and when he went there he found twenty-four dollars and some cents in one of the pockets of them.
The prisoner at the bar, William Thomas, stands indicted of the crime of murder in the first degree, the victim of his violence being his own wife, Sarah E. Thomas; I say of his violence, because the act of killing of the wretched woman is admitted by the prisoner's counsel. Before I proceed to notice this alleged crime, the law applying to it, and the evidence by which the charge of malicious homicide is sought to be established on the one side, and is denied upon the other, I desire to say to you, that the case itself in its several aspects has been presented to you, by the learned Attorney General and his deputy, and by *Page 522 
the counsel for the prisoner, with a very high degree of ability, as well in the production and examination of their witnesses, as in the discussion of the questions of law upon which our opinion has been sought, and of fact where it is your province to make the ultimate verdict. And I further say to you, gentlemen, that I shall endeavor, in giving to you the judgment of the Court in this case upon the law pertaining to it, not to allow myself to be influenced, to the prejudice of the defense of the prisoner, by any words said by his counsel to the Court, or omitted to be said by him, holding it as we do not only our duty, but regarding it as a pleasure also, to say nothing to a jury at any time that we are not called upon to say by the nature of the case on trial, its claims and its defenses.
It is not to be denied, gentlemen, that a very shocking homicide was committed within the body of this county on Friday the fifth day of last month. A man killed his wile in the city of Wilmington by cutting her throat with a razor, and thereby producing, as we may conclude, instantaneous death. The prisoner at the bar was the slayer, and his wife the subject of his violence. A homicide so atrocious, shocked the sensibilities of the community of that city, and of the people throughout the entire State, for a knowledge of the act committed was borne to the remotest part of it very soon after it occurred. Upon the theory that the deed itself was done under the circumstances reported, and by a person of accountability, no crime has ever been perpetrated in Delaware at all equaling it in point of enormity. A mother, with three young female children, the eldest barely thirteen years of age, was slain, almost in their very presence, by her husband and their father. The slayer is now before you upon his trial for this act, which is alleged by the prosecuting officer of the State to be of the highest grade of homicide, murder of the first degree, and the indictment found by the grand jury so charges it in express terms. The prisoner has pleaded not guilty to this charge, and answers through his counsel that no crime whatever has been committed. *Page 523 
You are to determine gentlemen, who is right in this matter; and in so doing you are to be governed by the law, as we shall give it to you, and by the evidence as you have received it from the mouths of the witnesses.
In order that you may discharge yourselves, gentlemen, of the very painful as well as responsible duty now devolved upon you, that of deciding a question so momentous to this prisoner, and important to the welfare of the State also, it is necessary that you shall be informed upon the subject of homicide, or manslaying. Of course you know as well as we, what homicide is; but you may not so well know that, by the law, it is divided into two branches, felonious and not felonious. It is with the former, felonious Homicide that we have to do; for in this case no offense at all has been committed unless it be a felonious homicide. In this State there are three kinds of such homicide, murder in the first degree, murder in the second degree, and manslaughter.
Murder of the first degree is the intentional killing by one person of another with express malice aforethought; or in perpetrating or attempting to perpetrate any crime punishable with death. This definition is a perfectly simple one in the language employed in the books to express it, and cannot be misunderstood, except so far as the termmalice may be misleading. It is somewhat unfortunate that it should be necessary to use such a term to express a meaning which is not to be precisely understood without explanation. This term is not restricted to spite, malevolence, or ill-will to the deceased in particular, but is understood to mean that general malignity and recklessness of the lives and persons of individuals which proceed from a heart void of a just sense of social duty and fatally bent on mischief. This state is necessary to constitute the crime of murder, and it must be shown by some express act, to reach the grade of murder of the first degree; whereas murder of the second degree, or with implied or constructive malice, is an inference of law upon the facts found by the jury. Express malice is *Page 524 
shown by the circumstances attending the act, such as the deliberate selection and use of a deadly weapon knowing it to be such; a preconcerted hostile meeting whether in a regular duel with seconds, or in a street fight mutually agreed on, or notified and threatened by the prisoner; privily lying in wait; a previous quarrel or grudge; the preparation of poison or other means of doing great bodily harm, or the like. In the case of implied malice, the actual intention of the prisoner becomes an important fact, for though he may not have intended to take away life, or to do any personal harm, yet he may have been engaged in the perpetration of some other felonious (not capital) or unlawful act from which the law raises the presumption of malice. The other offense of homicide is that of manslaughter; which is where the killing is felonious by our statute, but as it lacks the ingredient of malice, is of far lower grade than either of the other crimes. A familiar example of it is where a person, under great provocation and in a sudden heat of passion, unfortunately slays another, having no previous design to take his life. It is not necessary to illustrate it further, nor, as we conceive, to treat, with more remark, the crime of murder in the second degree, or with malice implied in law; for the case you have in charge is unquestionably one of murder in the first degree, or it is no crime at all. Certainly, unless it has been shown by the evidence, adduced by the prisoner's counsel, to your satisfaction, that at the time he killed his wife he was so destitute of reason as not to be able to know that he was doing a wicked act, and that such destitution is to be regarded as the effect of insanity with which he was afflicted as a disease, he is guilty of murder in the first degree; because there is not only no provocation and sudden heat shown that can reduce the offense to manslaughter; but the expressed purpose to kill, as proved by the first witness, the unfortunate child of such wretched parents, together with the selection of the sharpest of all instruments, a razor, to do it with, a deadly weapon of the most fearful *Page 525 
kind, raises the offense to that of murder of the highest grade. In fact, the killing is admitted by the prisoner's counsel, as well as the means used to do it; but he contends that, nevertheless, no crime, in legal contemplation, was perpetrated, because the prisoner was insane and therefore incapable of the exercise of any reason, or will in relation to the offense imputed to him; in other words, when the act was done, the prisoner was a victim of the malady of delirium tremens,
or insanity from the excessive use of intoxicating liquor.
If it be true, gentlemen, that when the fatal cut was given by the prisoner, he was so insane as to be incapable of realizing the fact that he was doing a harmful and wicked act, and that from disease; then, instead of being an object of horror and detestation as a wife-murderer, he is entitled to our tenderest commiseration and pity, as one stricken by God with insanity. It would be inhuman, to a degree that I feel sure will never be witnessed in this State, to hold such an unfortunate being liable for any act done by him. This proceeding would be a gross outrage upon all justice should it result otherwise than in absolute acquittal, if such a person is upon trial. But here is a dreadful homicide committed, and the law presumes in the absence of contrary proof adequate to rebut the inference, that it was done maliciously; and it also implies the requisite mental capacity on the part of the doer of it. Both these presumptions must be got rid of by the proof in the case before you can acquit the prisoner at the bar; but when you have proved before you such a state of facts as requires you to treat him as incapable, at the time, of committing crime, of knowing that it was wrong to kill his wife, you have overthrown the latter presumption; and the other, that of malice, of course falls to the ground. In this case the defense set up is, that at the time of the act done, the prisoner was under the influence of delirium tremens, an insane disease, destroying accountability for his act of homicide; but to make such defense available he must show it by proof to *Page 526 
your satisfaction; and there is no presumption of its existence from any antecedent attack or fits from which he may have recovered. Has the prisoner's counsel shown such a condition of his client by proof to your minds convincing? That is a question of the most vital importance to him; for unless he has, your verdict cannot be given to him. Let me place the evidence before you as it was delivered, in order that you may, possibly, the better judge of this question.
This crime, if crime it be, was committed on the fifth of April last, not very long after nightfall. The prisoner was employed as a shipsmith in the manufactory or shipyard of the Harlan and Hollingsworth Company in the City of Wilmington, and was a skilled workman there. He appears to have been addicted to drink so far at least, as to have sprees as they are called. During the week of that Friday he had been absent from his work from Monday evening until Friday, at the time for work for the afternoon, when he returned to his post. According to the testimony of three of his associates in employment, he was then in a sad condition as is common with dissipated persons, looking, as they say, wild out of his eyes or rather eye, (for he has had the misfortune to lose the sight of one,) and his behavior at times was strange, in the manner shown you by some of them, not only during the work hours, but at their close when he left the building, which was by an unusual place of exit, and in an incomplete and unusual state of dress. They say to you, as did also Mr. Pratt, who followed them in their examinations, that in their opinion he was not in his right mind. He then reached home, where he found his miserable wife, as you are justified by the evidence in the case in supposing, in a state of intoxication. He sat down and remained silent until his little daughter asked him what he would have for his supper, which she prepared for him upon his assent. Having eaten it, he sat down for a short time, and then said he was going to bed. He went up to bed about eight o'clock she says, her mother soon after rising from *Page 527 
the lounge, and going to bed also. About ten minutes afterwards she states, she heard her father and mother talking in a low tone up stairs, but couldn't hear what they said. She then went to the stairs and heard her father charge her mother with going with another man. No reply was made and the witness heard nothing more until about fifteen minutes later when he said he wanted his wife to tell the truth; she replied she had no truth to tell. The witness's work (ironing) being then done she went up stairs into her own and the other children's room and partially undressed but did not get into bed. When she heard her father tell her mother to get out of bed, assigning as a reason to his wife that she was drunk. Her mother then came into their room, stood by her children's bed for a while and then went back again, her father still remaining in bed. Upon her mother offering to lie down, her father told her to go out of the room. She then returned and her father followed her and charged her with buying neckties and watch chains for another man. Upon her denying it, her father said she knew she did it, and to go and find them. Her father then took her by the arm and led her to his own room, she denying his charge. The witness followed them and shut the door of their room. She then went back and put on her dress; and then heard her father ask her mother whether she wanted to die in the dark; her mother replied that she did not. The witness then went and opened her parents' door; he was standing by the bed and her mother was lying upon the floor, and she saw him pick up a pitcher and heard him say he would smash her brains out; but he did not strike. He then however took her up and (using the child's expression) about one-half earned and dragged her down stairs, she, the witness, following. When he got down with her he laid her upon the lounge in the backroom and went to the cupboard for his razor, he having before he went down stairs ordered the witness to get it, which she refused to do. He did not tell her at the time what he wanted with it, but said afterwards that he was *Page 528 
going to cut her throat. When he went to the cupboard for the razor, the child was so frightened that she fled with one of her sisters to a neighbor's and gave the alarm. In about ten minutes she returned alone, went up stairs and found her younger sister beside the bed, and her mother lying on the floor of her room near the door and her father standing about five feet off with a razor in his hand. She was so frightened she did not look at her mother, but saw blood on the floor. She then states that she inquired "Father what have you done?" to which he replied "never mind Nellie dear, I have killed your mother and cut my own throat; I would have been hung anyway." The mother's throat had in fact been cut and she had died, as we may suppose, instantly; his throat was cut also but not fatally, as he no doubt intended. These are the facts of the homicide, and a more horrible detail I am sure has never been given within these walls where many a wicked crime has been proved. Upon the cross examination of the witness she stated that when her father went to work, his eye looked wild and he was trembling; that be was sick the day before and not well that morning; that when he came home he seemed worse and was shaking his head and talking to himself, and she had to speak to him two or three times before he would answer; that he; mother was intoxicated and had been lying on the lounge all day and went to bed very much intoxicated. She says however she was not frightened by his appearance, because when sober he was always kind to her mother and sisters, but that of late he was a hard drinker and got on sprees.
Laying out of view the testimony of the shop witnesses, and that of Mr. Pratt, and the concluding part of that of the child, there is no proof by any witness that there was anything in the appearance or manner of the prisoner on that fatal Friday, indicating that he was not in his right mind, except that the medical gentlemen who have been examined but had no actual knowledge of his state, and spoke as experts, or persons qualified by their profession, *Page 529 
learning and experience, have given their opinions as to his condition when the act was committed, and that he was insane at the time of the killing. It is in proof however, to you, by the testimony of one of those gentlemen, Dr. West, that he had attended him the day before fordelirium tremens, but that when he called to see him on Friday he was so well that he disused the treatment he was giving him: that he had regained his color, his eye had recovered its accustomed naturalness, and that he was cheerful, and asked his opinion about returning to his work, which he gave approvingly: and there is not any proof from the child who saw him on his return as before spoken of, that she observed anything about him different from what was usual when he was recovering from a fit of dissipation, for she was not alarmed by his appearance, as she says. Now here is the whole case of defense, so far as any one speaks who had actual knowledge of the prisoner's condition on the day and night of the homicide, except what you have heard about his state at the Hall. But the physicians all state, that in their opinions, from the facts proved, the prisoner was a victim of insanity, produced bydelirium tremens, at the time the deed was done.
Now, gentlemen, with this statement of the facts of this case, it is for you to decide whether there is in your minds as conscientious men, acting under the sanction of the oath you have taken, sufficient proof to convince you that this horrid act, so deliberately done by the prisoner, is to be ascribed to insanity from the disease of drink. And we say to you, and it is our duty to do it, that if it was the result of the mere phrensy of drunkenness upon that occasion, and not of actual insanity produced by con-continued dissipation, to use the language of Judge Wooten who delivered the opinion of the Court of General Sessions in a case called for such an expression, it will not excuse this crime; for dunkenness is no excuse for, but an aggravation of, an offense, and goes for nothing unless actual insanity is the consequence. Society would have *Page 530 
no protection if violence could be excused by drunkenness: but when drunkenness, or dissipation is so long continued that insanity is the result, then the insanity excuses, though it is the consequence of the party's own act.
Bearing always in mind the fact that insanity is not to be presumed, but must be affirmatively proved to overcome the legal presumption of sanity in all cases, you must give to this case your best consideration and make up such a verdict as the law and the proof demands at your hands, never losing sight of the fact of the high and momentous duty imposed upon you, and that if the acts and conduct of the prisoner show to your minds conclusively that he had sufficient reason to contemplate the act he did, and its consequences at the time he did it, they are of more value than the opinions of witnesses, how learned and experienced soever they may be. It is due to the prisoner also that we should say to you, that if upon a calm review and consideration of all the testimony, and regarding it alone, you have in your minds a reasonable doubt, a doubt such as an honest, candid, intelligent mind may entertain, in this case, of the guilt of the prisoner, that is, of his capacity to know that it was wrong to kill his wife, he is entitled to the benefit of that doubt and should be acquitted; but otherwise you should convict him. It is precisely in the highest grade of homicide that the plea of insanity is urged in the prisoner's behalf; and you should therefore weigh the testimony carefully before you allow it in the case before you. The magnitude of a crime is in itself no evidence of insanity; otherwise great offenses would for the most part, go unpunished.
 Verdict — "Not guilty." *Page 531